1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    HOWARD STREET,                          Case No.  11-cv-05126-JST (PR)

                     Petitioner,
8                                            **ORDER DENYING PETITION FOR**
                                             **WRIT OF HABEAS CORPUS;**
9           v.                               **DENYING CERTIFICATE OF**
                                             **APPEALABILITY**
10   W. KNIPP, Warden,

11                   Respondent.

12

13          Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to

14   28 U.S.C. § 2254 by petitioner Howard Street, challenging the validity of a judgment obtained

15   against him in state court.  Respondent filed an answer to the petition.  Petitioner has filed a

16   traverse.

17                              **I.  PROCEDURAL HISTORY**

18          On October 30, 2007, an Alameda County jury found petitioner guilty of attempted

19   premeditated murder of a police officer with enhancements for personal use and discharge of a

20   firearm, and possession of a firearm by a felon.  (Respondent's Ex. 1[1], Clerk's Transcript (CT)

21   1004-23.)   Petitioner admitted six prior serious felony conviction and a prior strike conviction.

22   (CT 1024-25; Ex. 2, Reporter's Transcript (RT) 2561-68.)  On January 10, 2008, the trial court

23   sentenced petitioner to 56 years and 4 months to life in prison.  (CT 1030-36.)

24          Petitioner directly appealed the judgment in the California Court of Appeal.  On June 30,

25   2010, in a reasoned opinion, the California Court of Appeal affirmed the judgment.  (Ex. 6.)  On

26

27   ───────────────────────

28   [1] All references herein to exhibits are to the exhibits submitted by respondent in support of the
     answer.

1  October 20, 2010, the California Supreme Court summarily denied the petition for review.  (Ex.

2  8.)  The instant petition was filed on October 19, 2011.

3                                **II.  STATEMENT OF FACTS**

4          The following background facts describing the crime and evidence presented at trial are

5  from the opinion of the California Court of Appeal.[2]:

6

7          *Prosecution Evidence*

8          The charges against [petitioner] arose out of a police pursuit in the early morning of May
   17, 2005.  Berkeley Police Officer Brian Hartley was driving near Interstate 80 when he

9      saw a black Mustang convertible speed off the freeway and onto University Avenue.
       Officer Hartley pulled in behind the Mustang at a red light.  Officer Rashawn Cummings,

10     who was driving nearby, pulled in behind Officer Hartley.  When the light changed the
       Mustang accelerated and sped through the neighborhood, with both officers in pursuit.

11     Officer Hartley broadcast the pursuit over the police radio.

12     The Mustang sped around several corners and ran a red light, nearly hitting another car,

13     before speeding south on 6th Street.  The officers terminated the chase because it was too
       dangerous for a routine traffic stop, but after several minutes they spotted the Mustang

14     driving up 5th Street.  The Mustang screeched to a halt at a driveway north of Delaware
       Street and two men jumped out.  Officer Hartley pulled in behind the Mustang and chased

15     the suspects on foot through driveways, parking areas, alleys and yards.  Officer
       Cummings drove to 6th Street in case the suspects fled in that direction.

16

17     Officer Darren Kacalek was patrolling in the area, heard Officer Hartley's initial broadcast
       and joined the pursuit.  He drove onto Delaware Street and got out of his car to establish a

18     perimeter designed to stop the suspects if they fled south.  Officer Hartley returned to the
       area of his patrol car in case the suspects doubled back to the Mustang.

19

20     Officer Kacalek had his flashlight in his left hand and his gun in his right when he saw
       [petitioner] emerge from a path between buildings at the north end of the parking lot and

21     head south across the Delaware Street lot.  [Petitioner] was moving at a slow jog, crouched
       down with his hand in front of him in a "ready" position.  When [petitioner] was about 20

22     feet away, Officer Kacalek pointed his flashlight and gun at him, yelled "police," and
       ordered him to stop and get down.  [Petitioner] looked at the officer and said, "No, no, I

23     ain't got nothing."  He kept repeating "I ain't got nothing" and continued walking south
       across the parking lot.  Kacalek repeated his order six or eight times, but [petitioner] did

24     not comply.

25

26     _____

27     [2] This summary is presumed correct.  <u>Hernandez v. Small</u>, 282 F.3d 1132, 1135 n.1 (9th Cir.
       2002); 28 U.S.C. § 2254(e)(1).

28                                              2

United States District Court
Northern District of California

Officer Kacalek holstered his gun and flashlight, broadcast "foot chase" over the radio, and attempted to tackle [petitioner]. The men wrestled and fell to their knees. Office Kacalek continued to order [petitioner] to get down and stop resisting. [Petitioner] yelled "I got AIDS, I got AIDS," as the two men continued to grapple. He broke free and ran slowly away from the Delaware Street lot on a pathway between buildings. Officer Kacalek caught up to [petitioner] about 20 yards down the path and tried to subdue him by applying a wrist lock. Both men were winded. They fell to the ground and again started wrestling. Officer Kacalek tried to subdue [petitioner] with blows to his face, but because of their close proximity he was unable to put any force into his punches.

[Petitioner] again broke free and the foot chase resumed until [petitioner] came to a three-foot-high gate. He turned and looked at Officer Kacalek as he opened the gate, went through and closed it behind him. Officer Kacalek stumbled as he stepped over the gate but regained his footing and continued the pursuit. [Petitioner] was tired and moving slowly. He went through another gate to the side yard of an apartment building at 1800 6th Street. He knocked on the door, saying "Help, let me in." [Petitioner] looked back at Officer Kacalek at least once as he was knocking on the door.

Officer Kacalek drew his gun and repeatedly ordered [petitioner] to the ground. Again, [petitioner] did not comply. Looking back at Officer Kacalek once more, [petitioner] walked away from the well-lit area of the doorway to a darkened area just south of the apartment building. The officer, about 10 feet away from [petitioner], holstered his gun and took out his flashlight and baton. He tried to turn the flashlight on but it was not working. As Officer Kacalek approached he saw [petitioner] crouched over and he appeared to be digging through a garbage bag. The officer held up his baton and again ordered [petitioner] to get down, but he did not comply.

Officer Kacalek approached [petitioner] and when he was six feet away, [petitioner] stood up and shot him in the chest. The bullet passed through Officer Kacalek's badge and lodged in his bulletproof vest after penetrating six layers of Kevlar. [Petitioner] raised the gun again and pointed it at the officer's head. Office Kacalek threw his head back just as [petitioner] fired. He felt an impact and the heat of a muzzle blast singe his forehead. [Petitioner] fired yet again as Officer Kacalek ran back north toward Delaware. Officer Kacalek drew his gun as he ran, then ducked into some shrubs and pointed his gun back toward [petitioner]. [Petitioner] fired again. This time the officer returned fire. Other officers arrived and pursued [petitioner] while one officer escorted Officer Kacalek to a waiting ambulance.

[Petitioner] climbed through the open rear window of an apartment at 1800 6th Street occupied by Alejo Vega and Arnita Osborn. [Petitioner] knew Osborn and had been in the apartment earlier that evening. Osborn and Vega said they were awakened around 2:30 in the morning by a thump on the door. They heard shots and someone yelling "Hold it, freeze right there." [Petitioner] came out of the apartment's back bedroom. He was nervous and pacing. He said "They are after me." Osborne asked if it was the police outside, and [petitioner] replied "Yes."

3

[Petitioner] was cornered by officers and arrested at gunpoint when he tried to flee the apartment with Vega. Police found [petitioner's] .40 mm Beretta semiautomatic pistol under the bed in the back bedroom of the apartment. His loaded .9 mm Intratec semiautomatic pistol was found near the Mustang, behind a fence along the path [petitioner] took when he fled.

Three officers who encountered [petitioner] during the pursuit and after his arrest, including Officer Kacalek, reported that he did not appear to be under the influence of drugs or alcohol.

### Defense Case

[Petitioner] began drinking and using marijuana, acid and mescaline when he was about 11 years old and started using cocaine when he was 13 or 14. He later began dealing cocaine and heroin. He was convicted of cocaine sale in 1987, felony escape in 1989, robbery and auto theft in 1995, and being a felon in possession of a firearm in 2001. In April 2005, he escaped from a federal halfway house. When he was in prison in 1987 he joined the Black Guerilla Family gang for about a year, but he went through "debriefing" at Pelican Bay in order to drop out of the gang.

[Petitioner] experienced violence on the streets of Oakland and Berkeley "all [his] life" and had been shot numerous times. In 1991, he saw his cousin get killed in a drug-related shooting. In 1992 or 1993, he was shot four times in the chest and twice in the leg, but survived because he was wearing a bulletproof vest. In 1995, he was shot eight times in the back, stomach, leg and hip. In 1996, he was shot 11 times with a .45 caliber gun, this time in his chest, shoulder, hip, side, groin and wrist. [Petitioner] alleged he experienced nightmares, visions, lightning flashes and voices as a result of these shootings. He received psychiatric care while incarcerated and at times was prescribed Thorazine and Haldol.

[Petitioner] said that he started having anxiety attacks after he was assaulted by police at the Berkeley Jail in 1997. He also escaped from a federal halfway house because he was afraid his enemies in the Black Guerilla Family would find him there and kill him.

May 16, 2005, was like any other day for [petitioner]. He spent the day drinking and using drugs, and was high when he exited the freeway onto University Avenue the morning of May 17th. He and his passenger sped away when they saw Officer Hartley's police car because they had cocaine and a gun in the car. When he thought they had lost the police, [petitioner] parked north of Delaware Street and hid the gun in the bushes, but someone yelled that the police were coming. As Officer Hartley was pulling in behind the Mustang, he saw [petitioner] and a younger man known as "Skeet" jump a fence and flee toward Osborn's apartment. [Petitioner], whose mobility was impaired by his previous injuries, limped slowly across the Delaware Street parking lot while Skeet turned back to retrieve the gun.

[Petitioner] thought he had finally shaken the police. As he knelt down to tie a shoelace an

4

unknown man came up behind him, knocked him to the ground, put a gun to his head and said "I got you. Don't move."  Skeet or someone else pulled the assailant off [petitioner's] back.  When [petitioner] got up, he continued toward Osborn's apartment when the assailant grabbed the back of his jacket and slammed him into a concrete wall.  He again broke away, but the assailant grabbed him again and started punching him in the head and face, pulled [petitioner's] jacket over his head and kneed him in the face.

[Petitioner] was able to push the assailant off, but it was dark and he could not identify his attacker.  The encounter was different from [petitioner's] previous encounters with police because there was only one person chasing him rather than three or four, there were no flashlights or radios, and the person did not use mace.  [Petitioner] thought the assailant could be a contract killer or with the Black Guerilla Family.

[Petitioner] fled down the pathway, but the assailant caught up to him and administered more blows before he could escape again.  [Petitioner] never heard his pursuer say anything during their struggles.

When [petitioner] reached Vega and Osborn's apartment, the assailant caught up to him again and put a pipe across his throat in a choke hold.  [Petitioner] shook him off and fell against the apartment door.  He thought the man might be a police officer but he did not think it was possible because he had evaded Officers Hartley and Cummings.  He saw that the man was holding a chrome gun, but he did not recognize him as an officer because he was only focusing on the man's hands and the gun.

At that point [petitioner] heard Skeet call "over here, over here," and he went over to where Skeet was waiting behind the apartment building.  Skeet asked [petitioner] who was chasing him.  [Petitioner] said he did not know, and that he thought he was "going down this time."  Skeet handed [petitioner] a Beretta pistol.  [Petitioner] heard a "click, click," which he thought was either a gun misfiring or the release of a gun's safety.

[Petitioner] raised the Beretta and shot without aiming.  He was blacking out as he pulled the trigger, but the sound of his gunfire revived him and he ducked behind some garbage cans under the stairwell, threw the gun in one of the cans, and climbed through the window of Osborn's apartment.

Inside the apartment [petitioner] partially undressed to see if he had been shot.  He also wanted to pretend he was sleeping because he knew there were police in the area and that they would investigate the gunfire.  Nonetheless, [petitioner] soon left the apartment with Vega and returned to the alley to see if there was a body on the ground.  After checking the alley, the two men walked back past the apartment door.  [Petitioner] felt like he was "under water" and could not hear anything, as though his ears were closed.  He climbed up the stairs and found himself caught in the spotlight from a helicopter.  He thought the light was coming from God because he heard a voice saying "son, be calm."  At that point it was as though the sound came back on, and he heard the helicopter and voices telling him to get on the ground.

5

United States District Court
Northern District of California

> Psychiatrist Fred Rosenthal testified that [petitioner] suffered from post-traumatic stress disorder as a result of the violence and prior shootings he had experienced. Dr. Rosenthal explained that people who suffer from post-traumatic stress disorder become nervous, fearful, hyper vigilant and paranoid. They may act impulsively and lose the ability to think clearly.
>
> Jonathan Abramson lived on 5th Street near Delaware. On the night of the incident he was awakened by the sound of a male voice saying "don't shoot me," followed by about six gunshots.

People v. Street, No. A120412, 2010 WL 2602052, at *1-5 (Cal. Ct. App. June 30, 2010) (footnote omitted).

## III. DISCUSSION

A.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at

6

405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review.  The Court of Appeal, in its opinion on direct review, addressed the four claims petitioner raises in the instant petition.  The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews herein.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

B.      Petitioner's Claims

Petitioner asserts the following grounds for relief: (1) the trial court erred in instructing the jury pursuant to CALJIC No. 5.17; (2) the trial court erred in refusing to give a pinpoint instruction on the basis of petitioner's belief in the need for self-defense; (3) the trial court erred in refusing a defense request for an instruction on provocation; and (4) the presence of uniformed police officers in the courtroom violated petitioner's due process rights.

/ / /

United States District Court
Northern District of California

1

2

3     1.      Instructional Error – CALJIC No. 5.17

4     Petitioner claims that the trial court erred when it instructed the jury, pursuant to CALJIC

5  No. 5.17, that imperfect self-defense was not available to a defendant whose wrongful conduct

6  caused the circumstances that legally justified the victim's use of force.  (Petition at 7.)  The Court

7  of Appeal summarized the background of this claim as follows:

> Over defense objection, the court gave the jury a slightly modified version of CALJIC No.
> 5.17.  [Petitioner's] claim of error centers on the third paragraph of the instruction.  The
> jury was instructed: "A person, who attempts to kill another person in the actual but
> unreasonable belief in the necessity to defend against imminent peril to life or great bodily
> injury, attempts to kill unlawfully, but does not harbor malice aforethought and is not
> guilty of attempted murder.  This would be so even though a reasonable person in the same
> situation seeing and knowing the same facts would not have had the same belief.  Such an
> actual but unreasonable belief is not a defense to the crime of attempted voluntary
> manslaughter.  [¶] As used in this instruction, an 'imminent' peril or danger means one that
> is apparent, present, immediate and must be instantly dealt with, or must so appear at the
> time to the perpetrator.  [¶] *However, this principle is not available, and malice
> aforethought is not negated, if the [petitioner] by his unlawful or wrongful use of force
> created the circumstances which legally justified his adversary's use of force."*  (Italics
> added.)  The italicized paragraph varies slightly from CALJIC No. 5.17, which states:
> "[However, this principle is not available, and malice aforethought is not negated, if the
> [petitioner] by [his][her] [unlawful] [or] [wrongful] conduct created the circumstances
> which legally justified [his][her] adversary's [use of force], [attack] [or] [pursuit].]"  In its
> instruction, the court substituted "wrongful use of force" for "wrongful conduct" in order to
> focus the jury's attention on [petitioner]'s act of forcibly resisting arrest, rather than his
> earlier flight from police.

18  People v. Street,  2010 WL 2602052 at *5.

19     A challenge to a jury instruction solely as an error under state law does not state a claim

20  cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62, 71-72

21  (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that

22  "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

23  process.'"  Id. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  The instruction may

24  not be judged in artificial isolation, but must be considered in the context of the instructions as a

25  whole and the trial record.  Id.  Petitioner also must show actual prejudice from the error, i.e., that

26  the error had a substantial and injurious effect or influence in determining the jury's verdict, before

27  the court may grant federal habeas relief.  Calderon v. Coleman, 525 U.S. 141, 146 (1998) (citing

28

United States District Court
Northern District of California

8

Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

Here, the Court of Appeal rejected petitioner's instructional error claim, finding that the trial court's instructions were accurate:

> [Petitioner] argues it was wrong to instruct the jury that he could not rely on imperfect self-defense unless he was legally blameless for his confrontation with Officer Kacalek. He concedes that imperfect self-defense would be unavailable if he knew he was forcibly resisting a police officer. But he contends the instruction erroneously told the jury that imperfect self-defense was also unavailable if he honestly, but unreasonably, did not know that his assailant was an officer. In that circumstance, [petitioner] argues, he did not know his own use of force to resist Officer Kacalek was wrongful or unlawful, and the jury should have been permitted to consider his subjective belief in determining whether imperfect self-defense applied in this case. The law does not support his position.

People v. Street, 2010 WL 2602052 at *6.

The Court explained that CALJIC No. 5.17 was taken from In re Christian S., 7 Cal. 4th 768 (1994), in which the California Supreme Court observed that:

> [T]he ordinary self-defense doctrine-applicable when a defendant reasonably believes that his safety is endangered-may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances. For example, the imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense.

Christian S., 7 Cal. 4th. at 773, n. 1.

While the Court of Appeal acknowledged that the cited language in Christian S. was dictum, it went on to cite and analyze post-Christian S. cases in which "both the [California] Supreme Court and our intermediate Courts of Appeal have consistently applied its wrongful conduct limitation to imperfect self-defense." People v. Street, 2010 WL 2602052 at *7. The Court of Appeal concluded that "[w]hat was dictum in Christian S. is now settled law." Id.

In sum, the California courts have conclusively resolved the issue against petitioner. See e.g., People v. Seaton, 26 Cal. 4th 598, 664 (2001) ("Because [] defendant's testimony showed him to be the initial aggressor and the victim's response legally justified, defendant could not rely on

9

unreasonable self-defense as a ground for voluntary manslaughter.")  This Court must defer to the California courts' interpretation of its law on imperfect self-defense.  See Estelle, 502 U.S. at 67-68 (holding federal writ not available for alleged error in the interpretation or application of state law); Aponte v. Gomez, 993 F.2d 705, 707 (9th Cir. 1993) (holding federal courts are "bound by a state court's construction of its own penal statutes"); Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

Accordingly, petitioner is not entitled to relief on this claim as the jury instruction was proper pursuant to state law and regardless, the state court denial of this claim was not an unreasonable application of clearly established federal law.

2.    Instructional Error – Pinpoint Instruction

Petitioner claims the trial court erred in refusing to give his proposed pinpoint instruction on the basis of petitioner's belief in the need for self-defense.  (Petition at 22.)  The Court of Appeal summarized and rejected this claim as follows:

> [Petitioner] requested a pinpoint instruction that "[t]here need not be a reasonable basis for the defendant's belief in the necessity to defend.  That belief may be the product of intoxication, a mental condition, a simple mistaken perception-or some combination thereof."  The court refused the instruction, noting that it was redundant of other instructions and, to the extent not redundant, was erroneous.  We agree.
>
> First, the instruction incorrectly states the law because it is not limited to imperfect self-defense.  [Petitioner] was advancing both perfect and imperfect self-defense, and the jury was instructed on both.  Although [petitioner] presumably intended this instruction to apply only to his claim of imperfect self-defense, the language of the requested instruction contains no such limitation.  By failing to differentiate between imperfect and perfect forms of self-defense – the latter of which, of course, requires a *reasonable* belief in the necessity to defend one's self – the proposed instruction misstated the law and injected the likelihood of confusing the jury.
>
> …
>
> The instruction was also repetitive.  "Where the proposed instructions are repetitious of others, or merely elaborate on the general instructions, the trial court may refuse to give them."  (*People v. Thongvilay* (1998) 62 Cal.App.4th 71, 82, 72 Cal.Rptr.2d 738.)  The jury was instructed that "Evidence has been received regarding a mental disorder of the

United States District Court
Northern District of California

defendant at the time of the commission of the crime charged namely, attempted murder on a peace officer in Count 1, or lesser crimes thereto, namely attempted murder or attempted voluntary manslaughter.  You may consider this evidence for the limited purpose of determining whether the defendant actually formed the required specific intent, premeditated, deliberated or harbored malice aforethought which is an element of the crime charged in Count 1, to-wit attempted murder of a peace officer or the lesser crimes of attempted murder or attempted voluntary manslaughter."  The jury was also instructed to consider [petitioner]'s intoxication (if it found him to be intoxicated) in deciding whether he had the required specific intent or mental state for the charged crimes and to "consider all the circumstances as they were known *and appeared to the defendant* " (italics added) in evaluating his belief in the need for self-defense.  While imperfect self-defense and its interplay with malice are, as [petitioner] points out, complex concepts, the instructions as a whole adequately covered the subjects and [petitioner's] claims.  The court did not err in rejecting [petitioner's] proposed pinpoint instruction.

People v. Street,  2010 WL 2602052 at *11.

Petitioner's claim regarding the trial court's refusal to give his proposed pinpoint instruction fails for the same reason as his first claim of instructional error, i.e., it is not cognizable on federal habeas because it is predicated on a challenge to the state court's interpretation of state law.  As discussed, the state court found the proposed pinpoint instruction would have been erroneous.  This Court is bound by said finding.  See Estelle, 502 U.S. at 67-68; Bradshaw, 546 U.S. at 76.

Further, a state trial court's failure to give an instruction does not alone raise a ground cognizable in federal habeas corpus proceedings.  Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988).  The defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory.  United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996); United States v. Tsinnijinnie, 601 F.2d 1035, 1040 (9th Cir. 1979).  "Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury."  Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995).  The omission of an instruction is less likely to be prejudicial than a misstatement of the law.  Walker v. Endell, 850 F.2d 470, 475-76 (9th Cir. 1987).  A habeas petitioner whose claim involves a failure to give a particular instruction, as opposed to a claim that involves a misstatement of the law in an instruction, bears an " 'especially heavy burden.' "  Villafuerte v.

Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).

Here, this Court, having reviewed the record, agrees with the Court of Appeal's finding that the instructions given adequately embodied the law on imperfect self-defense.  As discussed above, the jury was instructed pursuant to CALJIC 5.17 on imperfect self-defense.  (CT 969.)  The instruction on imperfect self-defense includes the proviso: "In evaluating the defendant's beliefs, consider all circumstances as they were known and appeared to the defendant."  (Id. (emphasis added).)  The jury was also instructed on the role of PTSD and intoxication in assessing petitioner's subjective belief:

> Evidence has been received regarding a mental disorder of the defendant at the time of the commission of the crime charged namely, attempted murder on a peace officer in Count 1, or lesser crimes thereto, namely attempted murder or attempted voluntary manslaughter. You may consider this evidence for the limited purpose of determining whether the defendant actually formed the required specific intent, premeditated, deliberated or habrbored malice aforethought which is an element of the crime charged in Count 1, to-wit attempted murder of a peace officer of the lesser crimes of attempted murder or attempted voluntary manslaughter.

(CT 959 (citing CALJIC 3.32).)

> In the crimes of attempted murder of a police officer, robbery and carjacking, of which the defendant is accused in Counts 1, 3 and 4, or that of attempted murder, which is a lesser crime in Count 1, a necessary element is the existence in the mind of the defendant [of] the specific intent and/or mental state as defined in those crimes.
>
> If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether defendant had the required specific intents and/or mental state.
>
> If from all the evidence you have a reasonable doubt whether the defendant formed that specific intent required in a given charge or formed the required mental state, you must find that he did not have such specific intent or mental state.

(CT 960 (citing CALJIC 4.21).)

> Under the law, it is the general rule that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition.
> …
> However, there is an exception to this general rule, namely, where a specific intent or mental state is an essential element of a crime.  In that event, you should consider the

12

defendant's voluntary intoxication in your determination of whether the defendant possessed the required specific intent or mental state at the time of the commission of the alleged crime.

Thus, in the crimes of attempted murder of a peace officer in Count 1, or the lesser crime of attempted murder, a necessary element is the existence in the mind of the defendant of a certain specific intent or mental state which is included in the definition of each crime set forth elsewhere in these intstructions

If the evidence shows that a defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether or not the defendant had the required specific intent or mental state.

If from all the evidence you have a reasonable doubt whether the defendant had the required specific intent or mental state, you must find that defendant did not have that specific intent or mental state.

(CT 961 (citing CALJIC 4.21.1).)

Thus, although the trial court gave no pinpoint instruction stating explicitly that an unreasonable belief that one was under attack would negate the malice required to find petitioner guilty of attempted murder, the instructions that were given permitted petitioner to make that argument. Indeed, defense counsel argued this point extensively in connection with the instructions given, directly discussing the issues of mental disorder and intoxication as related to the actual belief in the need to defend. (RT 2456-68.)

Finally, petitioner's claim fails because the proposed pinpoint instruction was directed at elaborating on the lesser-included offense of attempted voluntary manslaughter predicated on imperfect self-defense.[3] (See Ex. 3 (Petitioner's Opening Brief on Appeal) at 76-77.) The failure of a state trial court to instruct on lesser-included offenses in a non-capital case, such as this, does not present a federal constitutional claim. Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000).

---

[3] "Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." People v. Birks, 19 Cal. 4th 108, 117-18 (1998). That is, if a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser-included offense within the former. Attempted voluntary manslaughter is a lesser-included offense of attempted murder. See People v. Cole, 33 Cal. 4th 1158, 1215-16 (2004).

Accordingly, petitioner is not entitled to relief on this claim as the proposed jury instruction was not a proper statement of state law and regardless, the state court denial of this claim was not an unreasonable application of clearly established federal law.

### 3.   Instructional Error – Provocation

Petitioner claims the trial court erred in refusing a defense request for an instruction on provocation as it related to premeditation and deliberation.  (Petition at 26.)  The Court of Appeal found petitioner waived this claim by not raising it in the trial court:

**A. Background**

On the first day of testimony, [petitioner] submitted a list of proposed jury instructions. The list included CALCRIM No. 522, a pinpoint instruction that provides: "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter].  The weight and significance of the provocation, if any, are for you to decide.  [¶] If you conclude that the [petitioner] committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the [petitioner] committed murder or manslaughter.]"  (CALCRIM No. 522.)  CALJIC No. 8.73 is the equivalent.[4]

More than two weeks later, the court presented the parties with a draft list of the instructions it intended to give and asked the parties to identify any instructions that were missing from the list.  Defense counsel noted several instructions he thought should be included in the court's list, and said he would e-mail the court with the instructions he wanted the court to add.

The next court day the court and parties went through the instructions, noting requests and objections for the record.  They specifically discussed the CALJIC series from No. 8.64 to 8.74, without making any mention of CALJIC No. 8.73 or CALCRIM No. 522.[5]

---

[4]

> CALJIC No. 8.73 provides: "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation."

[5]

> The trial court made clear to the parties that it generally preferred to give CALJIC instructions rather than the CALCRIM versions, although it did give several CALCRIM instructions requested by

14

The discussion of jury instructions continued on the following morning.  The court began by asking, "Tell me if I am skipping anything that is still up in the air."  After extensively addressing a number of instructions with counsel, the court asked whether they "have any problem with anything up to [CALJIC] 17.10?"  Defense counsel responded "No."  At the close of the discussion defense counsel addressed two proposed special instructions, again without mentioning CALJIC No. 8.73 or CALCRIM No. 522.

The court and parties revisited the jury instructions the next morning to tie up "a couple of loose ends."  Defense counsel alerted the court that CALJIC No. 3.32 had been omitted from the court's draft list of instructions.  The court noted that "[t]here was never a dispute in my mind it should not be given.  It just didn't make the first rough draft."  After further discussion on the language of specific instructions, at no point during which did the defense raise or request CALJIC No. 8.73 or CALCRIM No. 522, the court instructed the jury.  After the reading, with the jury absent, the court asked counsel whether he read everything as they expected.  Both parties confirmed that they did.

**B. Analysis**

[Petitioner] acknowledges that the court has no sua sponte duty to instruct the jury with CALCRIM No. 522 and its CALJIC equivalent.  [Citations.]  His contention, rather, is that he adequately preserved his request by including CALCRIM No. 522 on his initial list of proposed jury instructions.  We disagree.

As described above, after [petitioner] filed his list of requested instructions, the court provided the parties with a list of the instructions it intended to give. The court and the parties then engaged in an extensive discussion of the instructions spanning several court days.  [Petitioner] never raised or requested CALCRIM No. 522 or in any way commented on its omission from the court's proposed list during these discussions.  In light of [petitioner's] silence on this point when the trial court issued a draft list of instructions that omitted CALCRIM No. 522, and his persistent silence while the instructions were debated and finalized, we conclude [petitioner] has forfeited any right to challenge the omission in this court.  " ' "[W]here the court, through inadvertence or neglect, neither rules nor reserves its ruling . . . the party who objected must make some effort to have the court *actually rule*.  If the point is not pressed and is forgotten, [the party] may be deemed to have waived or abandoned it, just as if he had failed to make the objection in the first place." ' [Citations.] [¶]  This is an application of the broader rule that a party may not challenge on appeal a procedural error or omission if the party acquiesced by failing to object or protest under circumstances indicating that the error or omission probably was inadvertent.  [Citations.] ' "In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them." ' " (*People v. Braxton* (2004) 34 Cal.4th

[petitioner].  [Petitioner] never requested CALJIC No. 8.73.

798, 813-814, 22 Cal.Rptr.3d 46, 101 P.3d 994.)  On the facts shown here, [petitioner] waived appellate review of the issue by failing to raise it in the trial court.

People v. Street,  2010 WL 2602052 at *12-13.

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment.  See Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred.  See id. at 750. The rule cited here by the Court of Appeal, specifically, that a defendant must make a contemporaneous objection at trial in order to preserve an issue on appeal, has been found to be a sufficiently independent and adequate procedural rule to support the denial of a federal petition on grounds of procedural default.  See Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (finding claim procedurally defaulted based on California's contemporaneous objection rules).[6]

Further, the Court of Appeal determined that, even if there was an instructional error, it was harmless:

Moreover, [petitioner] cannot demonstrate any prejudice from the omission of CALCRIM No. 522.  The court instructed the jury under CALJIC No. 8.67 that "If you find that the attempt to commit murder was preceded and accompanied by a clear, deliberate intent to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection *and not under a sudden heat of passion or other condition precluding the idea of deliberation*, it is attempt to commit willful, deliberate, and premeditated murder."  (CALJIC No. 8.67.)  The jury was thus instructed to consider the effect of any possible provocation when it decided whether the shooting was premeditated and deliberate.  The jury also necessarily *rejected* [petitioner's] claim of provocation when it declined to convict [petitioner] of attempted manslaughter rather than attempted murder.  The jury was instructed that "When the act, though unlawful, is done in the heat of passion or is excited by a sudden quarrel that amounts to adequate provocation ... the offense is attempted voluntary manslaughter.  In that case, even if an intent to kill exists, the law is that malice, which is an essential element of attempted murder, is absent. [¶] To establish that a killing is attempted murder and not attempted voluntary

_____

[6] Although a petitioner may avoid procedural default by showing cause for the default and actual prejudice as a result of the alleged violation of federal law, or by showing the failure to consider the claims will result in a fundamental miscarriage of justice, see Coleman 501 U.S. at 750, petitioner here has made no such showing or even an effort to do so.

16

manslaughter, *the burden is on the People to prove beyond a reasonable doubt* each of the elements of attempted murder and *that the act was not done in the heat of passion or upon a sudden quarrel ....*" (CALJIC No. 8.50.)  The attempted murder verdict thus establishes that the jury necessarily found, beyond a reasonable doubt, that [petitioner] did not act "in the heat of passion or upon a sudden quarrel."  There is thus no possibility that an instruction on the effect provocation would have on premeditation and deliberation affected the verdict.

People v. Street,  2010 WL 2602052 at *13 (footnote omitted).  Based on an independent review

of the record, the state court's finding that petitioner suffered no prejudice from the omission of

CALCRIM No. 522 was objectively reasonable.

Accordingly, petitioner is not entitled to habeas relief on this claim.

4.      Due Process

Petitioner claims his due process rights were violated when the trial court allowed the

presence of uniformed police officers in the courtroom during opening statements.  (Petition at

13.)  The Court of Appeal summarized the background of this claim as follows:

On the first day of trial, before opening statements, [petitioner] objected to the presence of some 20 to 25 uniformed Berkeley police officers seated in the gallery.  The trial court stated it was not inclined to order the officers to leave or remove their uniforms unless defense counsel provided authority supporting his position that [petitioner's] due process rights were implicated and took precedence over the officers' rights as members of the public to attend the trial.

The court then preinstructed the jury, and included the standard instruction that "[y]ou must not be influenced by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.  Both the People and the defendant have a right to expect that you will conscientiously consider and weigh the evidence, apply the law, and reach a just verdict as to each count regardless of the consequences." (CALJIC No. 0.50.)  In addition, the court directed the jurors not to "in any way be influenced by who may or may not be here, members of the media or anyone else.  That's of no factor in this case, and you should keep that in mind."

The parties revisited the issue of the uniformed officers' presence after the prosecution gave its opening statement.  The trial court reiterated that it was not persuaded there was prejudice, and declined to exercise its discretion to exclude uniformed officers from the courtroom.  However, the court offered to revisit the issue if "it has become something that is there every day" and said it would consider giving further limiting instructions if offered by the defense.

Most of the uniformed officers remained for the [petitioner's] opening statements, but none returned the next morning.  The court also informally suggested that spectators not wear

17

1

uniforms to the trial.

2

Midway through trial, [petitioner] moved for a mistrial based on the officers' presence on
3   that day.  The court denied the motion.  Just before giving final instructions, the court
reiterated to the jury that "in general you shouldn't let anybody who's in the courtroom
4   influence you in any way.  We've had numerous people on occasion in the courtroom, one
day a substantial number in uniform.  Another day we had a bunch of visitors and four-
5   fifths of the audience were people who actually were from the People's Republic of China,
they were jurists there.  They made up the audience.  [¶] Is there anything about the
6   audience that in any way has influenced any juror or made any juror feel pressured in any
way?  Would you let me know that by raising your hand."  There were no responses.
7

8   People v. Street,  2010 WL 2602052 at *8-9 (footnote omitted).

9       The Court of Appeal rejected petitioner's due process claim finding that the trial court

10   properly balanced petitioner's concerns about possible improper influence with the officers' First

11   Amendment right to attend trial as members of the public.  People v. Street, 2010 WL 2602052 at

12   *9-10.  The Court of Appeal specifically found that the presence of uniformed officers on the first

13   morning of trial did not result in prejudice given that the trial court: (1) "suggest[ed] that those

14   police officers interested in attending wear civilian clothing if possible, after which no uniformed

15   officers attended the trial as spectators"; and (2) "twice admonished the jury not to be influenced

16   by the presence of anyone in the audience, including, specifically, uniformed officers, and

17   inquired whether any juror felt pressured or influenced  by the officers' presence."  Id. at *10.

18       The Supreme Court has explicitly held that it is an open question whether private-actor

19   courtroom conduct can be so prejudicial as to deny a defendant his right to a fair trial.  See Carey

20   v. Musladin, 549 U.S. 70, 76 (2006).  The petitioner in Musladin claimed that his trial was unfair

21   because spectators in the courtroom wore buttons bearing the image of the victim.  The Supreme

22   Court held that he was not entitled to relief under § 2254 because there was no "clearly established

23   Federal law" holding that conduct by courtroom spectators deprives a defendant of a fair trial.  Id.

24   at 76-77.  While the Supreme Court had previously addressed claims based on state-sponsored

25   courtroom practices[7], the effect of conduct by spectators was "an open question" in the Court's

26   _____

27   [7] In Estelle v. Williams, 425 U.S. 501 (1976), the Supreme Court addressed the effect of
compelling an accused to stand trial while dressed in identifiable prison clothes.  (Musladin, 549
28                                    18

United States District Court
Northern District of California

jurisprudence.  Id.  Here, petitioner offers no evidence that the presence of the uniformed officers was "state-sponsored," e.g., that they were present in an official capacity rather than as members of the public.  Nor is there any evidence in the record to support such a finding.  Consequently, petitioner's claim is foreclosed by Musladin.

Further, any error was harmless given: (1) the isolated nature of the alleged violation (with the uniformed officers present only for opening statements); (2) the trial court's admonition to the jury; and (3) the overwhelming evidence of petitioner's guilt presented at trial.  It cannot be said the alleged error had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry, 532 U.S. at 795.

Accordingly, petitioner is not entitled to habeas relief on this claim.

C.       Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  Id. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of

U.S. at 75.)  In Holbrook v. Flynn, 475 U.S. 560 (1986), the Supreme Court addressed whether seating additional security personnel, consisting of "four uniformed state troopers"  in the row of spectators' seats immediately behind the defendant, denied his right to a fair trial.  (Id.)

19

appealability will be denied.

### IV.  CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated:  October 20, 2013



_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

20